UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
JOHNEY PHAM,                                      :

                    Petitioner,         :             99 Civ. 11613 (WHP)

             - against -          :           MEMORANDUM AND ORDER

UNITED STATES OF AMERICA,            :

                   Respondent.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

        This action comes before this Court on remand following an appeal by Petitioner

Johney Pham ("Pham") of a decision from this District denying him a writ of habeas corpus.  See

Pham v. United States, 317 F.3d 178 (2d Cir. 2003).  Heeding the Second Circuit's mandate, this

Court held an evidentiary hearing to develop the record on each of the issues that the Court of

Appeals found unresolved in the earlier decision.  For the reasons set forth below, the evidence

confirms that Pham is not entitled to relief and his Petition must be denied.


PROCEDURAL HISTORY

        In an indictment unsealed in December 1994, the Government charged Pham and

twelve others with smuggling undocumented Chinese immigrants into the United States and

holding them for ransom at various locations, including Pham's house in New Jersey.  On

October 20, 1995, a jury convicted Pham of conspiracy to engage in alien smuggling and hostage

taking, conspiracy to receive ransom money, conspiracy to commit kidnapping, receipt of

ransom money in connection with kidnapping, transportation of illegal aliens and concealment

and harboring of illegal aliens.  Having presided over Pham's criminal case from its inception,

on November 12, 1997 District Judge Louis L. Stanton sentenced Pham principally to 210

months of incarceration.  By summary order dated October 1, 1998, the Second Circuit affirmed

Pham's conviction and sentence.  See United States v. Wei, 164 F.3d 620 (2d Cir. 1998).

On November 29, 1999, Pham filed a pro se petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2255.  Pham advanced nine separate theories why his conviction and

sentence should be vacated.  Among other arguments, Pham claimed that his court-appointed

trial counsel, Martin J. Siegel, Esq. ("Siegel"), provided ineffective assistance by failing to seek

a plea agreement with the Government or apprise him of the progress of such negotiations.  In a

Memorandum and Order dated April 12, 2000, Judge Stanton addressed each of Pham's claims

seriatim and concluded that they "clearly lack[ed] merit."  United States v. Pham, Nos. 99 Civ.

11613 (LLS), 94 Cr. 241 (LLS), 2000 WL 375245, at *1 (S.D.N.Y. Apr. 12, 2000).  Pursuant to

§ 2255, Judge Stanton dismissed the Petition without inviting a submission from the Government

or conducting an evidentiary hearing.

Of pertinence to these continued proceedings, Judge Stanton specifically

considered and rejected Pham's claim that Siegel did not adequately honor his request to pursue

a plea agreement.  Judge Stanton held:  "Assuming that Pham's counsel did not pursue the

alleged request (of which there is no evidence beyond Pham's own claims) Pham has not

demonstrated that his counsel's performance was outside the wide range of reasonable

professional judgment."  Pham, 2000 WL 375245, at *2.  Judge Stanton further concluded that

Pham failed to demonstrate that he was prejudiced by Siegel's alleged ineffectiveness.  Judge

Stanton reasoned that Pham undermined his claim that he would have accepted a plea offer by

"steadfastly maintain[ing] his innocence," and asserting in his Petition "that he 'did not

participate in any of those activities' for which he was indicted [and] . . . 'never personally

committed an act of kidnapping.'"  Pham, 2000 WL 375245, at *3.  Judge Stanton declined to

issue a certificate of appealability.  See Pham, 2000 WL 375245, at *7.

On May 1, 2000, Pham filed a Notice of Appeal, which the Court of Appeals construed as a motion for a certificate of appealability. Pham asserted, for the first time, that "the government may have indeed offered a plea, but Johney Pham's lawyer failed to report the offer to Pham." Thereafter, in an undated "Supplement to Motion" mailed on August 31, 2000, Pham again sought a certificate of appealability from the district court. Pham asserted that he had just learned through a Freedom of Information Act ("FOIA") request that the Government had made a plea offer (the "Global Plea Offer") to all defendants in his case and that Siegel failed to relay this offer to him. Pham attached a June 14, 1995 letter (the "Global Plea Letter") from then-Assistant United States Attorney Allen D. Applbaum ("Applbaum") to all defense counsel in Pham's criminal case. The Global Plea Letter offered Pham a sentence of 78-97 months if each defendant pleaded guilty. Pham asserts that had he known of the Government's offer, he would have pleaded guilty.

In a letter to the district judge dated October 7, 2000, the Government acknowledged the Global Plea Offer and included an affirmation by Siegel attesting that he communicated this and other plea offers to Pham, as evidenced by his June 16, 1995 letter to Pham at the federal correctional facility in Otisville, New York ("Otisville"). Siegel further attested that Pham consistently maintained "that he was innocent of the charges and would rather go to trial and lose than plead guilty to something he didn't do." (Affirmation of Martin J. Siegel, Esq., dated Oct. 6, 2000, at 1.) By Order dated October 12, 2000, Judge Stanton denied Pham's motion for a certificate of appealability.

Presumably unaware of the October 12th Order, Pham wrote to the district court on October 17, 2000. In that letter, Pham disputed the representations in Siegel's affirmation, maintained that he never received the Government's Global Plea Letter at Otisville and claimed that Siegel never visited him there. Pham contended that he could produce evidence to support

these representations and requested a hearing or, if not, a certificate of appealability.  By

Memorandum Endorsement dated November 2, 2000, Judge Stanton denied Pham's request for a

hearing and his renewed request for a certificate of appealability, referencing the discussion in

his April 12th Memorandum and Order that Pham's persistent claim of innocence belied any

assertion of prejudice.  In the meantime, Pham made a third request for a certificate of

appealability to the district court on October 30, 2000.  By Memorandum Endorsement dated

November 21, 2000, Judge Stanton denied that request as well.

On March 15, 2001, the Second Circuit granted Pham a certificate of appealability

solely on the issue of "whether his counsel failed to advise him of a plea offer made by the

government."  In an Opinion dated January 15, 2003, the Court of Appeals reversed the district

court.  The Second Circuit disagreed with Judge Stanton's ruling with respect to prejudice,

holding that "a significant sentencing disparity [between a plea of guilty and conviction after

trial] in combination with defendant's statement of his intention [to plead guilty] is sufficient to

support a prejudice finding," notwithstanding a protestation of innocence.  Pham, 317 F.3d at

182.  Applying that holding to the facts, the Second Circuit discerned that the disparity between

the 78-97 month sentence offered in the Global Plea Offer and the 210 month sentence Pham

received, in conjunction with Pham's claim that he would have pleaded guilty, necessitated

"[a]dditional evidence . . . before the district court could find that Pham would not have pleaded

guilty even if he knew of the government's plea offer."  Pham, 317 F.3d at 183.  The Court of

Appeals also suggested that Pham's protestations of innocence may deserve diminished

probative weight if Siegel failed to advise him of the nature of vicarious liability in the context of

conspiracy, a claim Judge Stanton did not address expressly in his decision.  Pham, 317 F.3d at

184.

The Court of Appeals also concluded that Judge Stanton's findings concerning whether Siegel relayed the Global Plea Offer to Pham were "not fully developed." Pham, 317 F.3d at 184. Professing "confusion . . . due to the piecemeal development of the record and the evolution of Pham's assertions," the Court of Appeals faulted the district court for deciding Pham's Petition summarily without conducting a hearing or at least inviting written submissions. Pham, 317 F.3d at 184. The Second Circuit remanded the action for further consideration in accord with its Opinion. See Pham, 317 F.3d at 185. Thereafter, Judge Stanton appointed counsel for Pham pursuant to the Criminal Justice Act. On December 8, 2003, the matter was reassigned randomly to this Court by the Clerk.

THE EVIDENTIARY RECORD

This Court conducted a two-day evidentiary hearing. In light of the Second Circuit's decision, this Court sets forth the facts of Siegel's representation of Pham in some detail, drawing them from the testimony and documentary evidence adduced at the hearing and from the parties' submissions both before and after remand.

Pham was arrested on December 19, 1994 and indicted on similar charges in both the Southern District of New York and the District of New Jersey. (Transcript of Hearing on Mar. 23-25, 2004 ("Tr.") at 9.) Pham was initially incarcerated at the Metropolitan Correctional Center ("MCC") in Manhattan. (Tr. at 9.) He was transferred to Otisville on June 5, 1995 but was frequently housed at MCC on a temporary basis. (Government Exhibit ("GX") 4; Tr. at 9.) Siegel met with Pham often between the time of his arrest and his trial in September and October 1995. (GXs 5, 17, 20, 22-26; Tr. at 9, 131, 135, 140, 142.) However, Siegel visited Pham only at MCC and never at Otisville. (Tr. at 9-10, 186.) Because Siegel does not speak Pham's native language of Vietnamese and Pham has difficulty communicating in English, Siegel utilized a

Vietnamese interpreter, Kien Tran, nearly every time they met.  (GX 5, 17, 20, 22-26; Tr. at 127, 155.)  According to Siegel, Pham "had a high comfort level with" Kien Tran and her English translation of Pham's comments were responsive to his, which suggested to Siegel that she was accurately translating his comments into Vietnamese.  (Tr. at 128, 157.)

I.  Initial Plea Negotiations

Assistant United States Attorney Applbaum and Siegel began discussing the possibility of a guilty plea in January 1995.  (Tr. at 95.)  Early the next month, Siegel visited Pham and explained that he could receive a reduced sentence either by cooperating with the Government or pleading guilty pursuant to an agreement.  (Tr. at 12, 129-31, 158-59.)  Siegel's notes corroborate this testimony.  (GX 17.)  Pham attests that he told Siegel that he would be "willing to plead guilty if the government would be willing to give [him] a plea for a sentence within the brackets of 5 to 8 years."  (Affidavit of Johney Pham, dated Oct. 28, 1999 ¶ 7.)  However, Pham also testified that he could not remember whether they ever discussed the option of pleading guilty.  (Tr. at 24-25, 79-80.)

On February 9 and 16, 1995, Pham and Siegel participated in proffer sessions with Applbaum to enable the Government to evaluate Pham's utility as a cooperating witness.  (GXs 18, 19; Tr. at 31, 48-51, 97, 132.)  A Vietnamese interpreter was present at both sessions.  (GX 18; Tr. at 31, 97, 119-20.)  In Applbaum's estimation, Pham admitted to facts that would support a guilty conviction on all counts and Applbaum relayed this to Pham.  (Tr. at 51, 84-85, 109-11, 116-18, 132-33.)  Pham indicated that he would be willing to plead guilty to alien smuggling but maintained that he was not guilty of kidnapping and would not plead guilty to such a charge.  (Tr. at 50-51, 110-11, 116-17.)  Applbaum ultimately decided not to use Pham as

a cooperating witness.  (Tr. at 99-100.)  Nonetheless, Applbaum contacted Siegel to explore the possibility of negotiating a non-cooperator plea agreement.  (Tr. at 100.)

Siegel testified that he met with Pham in March and May 1995 and again discussed the option of pleading guilty.  (Tr. at 131, 135, 158-59.)  Siegel's notes from their March conference state, "Discuss possible trial, plea or cooperate.  [Pham] will let me know." (GX 20.)  According to Siegel, Pham insisted at their May meeting that he would not plead guilty.  (Tr. at 135.)  Siegel's notes corroborate this testimony: "[Pham] says he did nothing wrong and therefore will not plea."  (GX 22.)  At a May 31, 1995 Court conference with Pham present, the Government indicated that it intended to make a plea offer to all defendants in the case contingent on their unanimous guilty pleas.  (GX 10 at 4, 8.)

II.  The Global Plea Offer

On June 14, 1995, Applbaum sent a letter memorializing the Government's Global Plea Offer to counsel for the six defendants who remained in Pham's case at that time. (GX 11; Tr. at 101.)  The Global Plea Letter provided that each defendant could receive a lesser sentence if all pleaded guilty to certain specified charges, with Pham entering a guilty plea to conspiring to commit alien smuggling and kidnapping.  (GX 11.)  The Global Plea Letter calculated Pham's potential sentence in the event he and his co-defendants accepted the Global Plea Offer as 78-97 months and contrasted that with his potential sentence of 188-235 months if he went to trial and lost.  (GX 11.)  By its terms, the Global Plea Offer expired on June 26, 1995. (GX 11.)

Pham claims that he never saw the Global Plea Letter prior to 2000.  (Tr. at 13, 14, 36, 38, 41; Declaration of Johney Pham, dated Oct. 11, 2003 ("Pham Decl.") ¶ 3.)  Although Siegel forwarded it to Pham at Otisville with a cover letter dated June 16, 1995, Pham was

temporarily relocated from Otisville to MCC around that time.  (GXs 4, 12; Tr. at 136.)

However, Siegel testified that he met with Pham at MCC on June 21 or 22, 1995 and thoroughly

explained the Global Plea Offer to him through the interpreter, Kien Tran.  (GXs 5, 23; Tr. at

136-39.)  In particular, Siegel explained that the Government was offering him approximately

seven years but that he could face seventeen years if he was convicted after a trial.  (Tr. at 138-

39.)  Siegel's notes corroborate his testimony.  (GX 23.)  Moreover, Siegel's notes indicate that

Kien Tran translated the Global Plea Letter into Vietnamese.  (GX 23; Tr. at 138.)  According to

Siegel, Pham again maintained that he did not know that the aliens were being held against their

will and would not plead guilty to kidnapping.  (Tr. at 139.)  Additionally, at that time, Siegel

and Pham's attorney in the New Jersey proceeding were endeavoring to negotiate a

comprehensive plea agreement to resolve both matters.  (Tr. at 47-48, 102, 139.)  Siegel's notes

indicate that Pham wanted to decline the Global Plea Offer in the hope of forging a

comprehensive agreement that included the New Jersey case.  (GX 23.) However, such an

agreement never materialized.  (Tr. at 102, 139-40.)

   Pham disputes that he and Siegel ever discussed the Global Plea Offer, although

his submissions and testimony on this issue do not present a coherent story.  In his declaration,

Pham attests, "I have no recollection of Mr. Siegel ever reviewing the substance of the proposed

plea agreement with me and I have no recollection of the proposed plea agreement being

translated for me."  (Pham Decl. ¶ 3.)  Pham also asserts that "neither Mr. Siegel nor any

translator ever explained to me what the pertinent sentencing guidelines ranges would be if I

pleaded guilty and if I went to trial and lost."  (Pham Decl. ¶ 4.)  Consistent with his Declaration,

Pham testified that he and Siegel never discussed the Global Plea Offer or his potential sentence.

(Tr. at 14, 38.)  However, he contradicted that testimony by stating that he and Siegel may have

had such discussions but the interpreter did not translate them accurately (Tr. at 14), that Siegel

told him there was a plea offer (Tr. at 13-14), and that Pham could not remember one way or the other whether such discussions occurred (Tr. at 38-40, 80-81).

Pham also claims that Siegel did not advise him that he could be guilty under a vicarious liability or willful blindness theory of participating in a kidnapping conspiracy even if he did not know that the aliens were being held against their will.  (Pham Decl. ¶ 5; Tr. at 17-18, 86.)  Pham asserts that he would have accepted the Global Plea Offer had he known (1) its terms; (2) the sentence he stood to receive under such an offer as compared to conviction after trial; and (3) the possibility that he could be found guilty even if he lacked specific knowledge of his co-conspirators' activities.  (Pham Decl. ¶ 5; Tr. at 18-21, 41, 43, 82, 87.)  By contrast, Siegel testified that he specifically explained the nature of conspiracy liability to Pham, although he concedes that he did not discuss willful blindness.  (Tr. at 133-34, 160-61.)

III.  The Individual Plea Offer

The Global Plea Offer expired on June 26, 1995.  Immediately thereafter, Siegel and Applbaum began discussions about negotiating a plea agreement for Pham individually.  (Tr. at 103.)  At the hearing, Applbaum explained that the Government rarely repackaged the terms of a global plea offer as an offer to only one defendant in order to maintain the incentive for defendants to enter global offers.  (Tr. at 103-04.)  However, after multiple negotiations with Siegel, Applbaum made an exception in Pham's case and prepared a written offer to Pham of a 78-97 month sentence in exchange for a guilty plea to the alien smuggling conspiracy and kidnapping conspiracy charges (the "Individual Plea Offer").  (GX 13; Tr. at 103-04.)

Siegel met with Pham on July 12, 1995.  (GXs 5, 24; Tr. at 140.)  At that meeting, according to Siegel, Pham again maintained that he did not know that the smuggled aliens were being held against their will, was not guilty of kidnapping and wanted to go to trial.  (Tr. at 140,

165.) Siegel's notes corroborate this testimony. (GX 24.) Thereafter, at Siegel's request, Pham and Siegel met with Applbaum for a reverse proffer, at which the Government disclosed the facts it believed could be proved at trial in an effort to convince Pham to accept a guilty plea. (Tr. at 49, 106-11.) A Vietnamese interpreter was present. (Tr. at 106, 119-20.) Applbaum then offered Pham the Individual Plea Offer he had negotiated with Siegel. (Tr. at 107-08.) Applbaum also explained to Pham, through the interpreter, that if he turned down the offer and went to trial, he could face a sentence two or three times longer than the offered sentence. (Tr. at 108.) Further, Applbaum explained the breadth of vicarious liability, as he had done in the February proffer sessions. (Tr. at 110-11.) Nonetheless, Pham turned down the Government's offer, maintaining that he was not guilty of kidnapping and would not plead guilty to a crime he did not commit. (Tr. at 50-51, 110-11, 113.) Applbaum testified that the Government would not accept a guilty plea from Pham that did not include a plea to the kidnapping conspiracy charge. (Tr. at 113.) Therefore, it became apparent to both Applbaum and Siegel at the conclusion of the reverse plea offer session that Pham was not going to plead guilty. (Tr. at 112-13.) Siegel and the Government had no further discussions about a guilty plea. (Tr. at 113.)

IV.  Pham's Co-Defendants

            Of Pham's co-defendants, only one went to trial with him on September 28, 1995. (Tr. at 95, 104, 143.) Except for the two who remained fugitives, each of the other nine defendants pleaded guilty prior to the start of Pham's trial pursuant to cooperation and other plea agreements with the Government. (Tr. at 94-95, 104.) Siegel informed Pham of this in August 1995. (GX 25; Tr. at 142.) Additionally, the Probation Department's presentence report ("PSR") detailed that each of these co-defendants had pleaded guilty and received lesser sentences as a result. (GX 33R; Tr. at 144.) Prior to sentencing, Siegel familiarized Pham with

the PSR by having it read to him in Vietnamese and providing him copies in both Vietnamese and English.  (Tr. at 53, 56-58, 144, 146-47, 174.)  Thus, Pham admits knowing at the time of his November 12, 1997 sentencing that his co-defendants had pleaded guilty and received sentence reductions.  (Tr. at 27, 53, 58-59.)  Nonetheless, Pham did not complain to Siegel or to Judge Stanton at his sentencing or in his post-trial motions that Siegel had failed to pursue or communicate plea offers.  (Tr. at 25-27, 59, 143, 150; see GX 15.)  Moreover, his letters to Siegel after he began his sentence were laudatory and appreciative rather than critical.  (GXs 39, 40; Tr. at 77-78, 150, 153-54.)  In fact, Pham testified that he was satisfied with Siegel's work through 1999.  (Tr. at 75.)  Pham claims that he did not understand that Siegel's alleged failings could have legal import until the beginning of his sentence, when he befriended an inmate who held a law degree.  (Tr. at 22, 79.)

DISCUSSION

I.  Ineffective Assistance of Counsel

As discussed above, while Pham advanced numerous theories for vacating his conviction and sentence to Judge Stanton, the Second Circuit granted a certificate of appealability only on the issue of "whether [Pham's] counsel failed to advise him of a plea offer made by the government."  On remand, Pham attempts to expand that narrow line of inquiry by challenging the adequacy of his pretrial interpreter and the nature and extent of Siegel's legal advice.  In accord with the Second Circuit's mandate, this Court considers only whether Siegel failed to convey the Government's Global Plea Offer to Pham and, if so, whether Pham was prejudiced as a result.  Pham, 317 F.3d at 182-85.

To establish ineffective assistance of counsel, a petitioner "must demonstrate both (1) that counsel's performance was so unreasonable under prevailing professional norms that

'counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment,' and (2) that counsel's ineffectiveness prejudiced the defendant such that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" United States v. Gaskin, 364 F.3d 438, 468 (2d Cir. 2004) (quoting Strickland v. Washington, 466 U.S. 668, 687, 694 (1984)); accord United States v. Cohen, 427 F.3d 164, 167 (2d Cir. 2005); Purdy v. United States, 208 F.3d 41, 44 (2d Cir. 2000). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Strickland's test is a "strict" one, Gaskin, 364 F.3d at 468, and the petitioner bears the "heavy burden" of establishing both prongs, Cohen, 427 F.3d at 171.

In analyzing the first prong of the Strickland test, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689 (internal quotation omitted). However, it is well-settled that failing to convey a Government plea offer constitutes inadequate assistance of counsel. Cullen v. United States, 194 F.3d 401, 404 (2d Cir. 1999); Purdy, 208 F.3d at 44-45; Muyet v. United States, No. 03 Civ. 4247 (PKL), 2004 WL 2997866, at *5 (S.D.N.Y. Dec. 27, 2004); accord Pham, 317 F.3d at 182.

To satisfy the second prong of Strickland, a petitioner claiming that his attorney failed to communicate a plea offer to him must establishes prejudice by demonstrating a reasonable probability that he would have accepted the offer if he had been aware of it. Purdy, 208 F.3d at 49; Cullen, 194 F.3d at 404; Mickens v. United States, No. 97-CV-2122 (JS), 2005 WL 2038589, at *3 (E.D.N.Y. Aug. 17, 2005). To satisfy this burden, a petitioner must offer more than his own "self-serving statements." Pham, 317 F.3d at 182; Rosario-Dominguez v. United States, 353 F. Supp. 2d 500, 521 (S.D.N.Y. 2005); Mickens, 2005 WL 2038589, at *3.

Rather, the petitioner must come forward with objective evidence that he would have accepted the plea offer. See United States v. Gordon, 156 F.3d 376, 380-81 (2d Cir. 1998); Muyet, 2004 WL 2997866, at *6. Such evidence may include "a great disparity between the actual sentence and the sentence that effective counsel would have secured for the defendant." Mask v. McGinnis, 233 F.3d 132, 141 (2d Cir. 2000) (internal quotation omitted); accord Pham, 317 F.3d at 182-83; Gordon, 156 F.3d at 381. A petitioner's "insistence on innocence is a factor relevant to any conclusion as to whether he has shown a reasonable probability that he would have pled guilty." Cullen, 194 F.3d at 407.

Pham does not meet this burden. In support of his contention that Siegel never advised him that the Government had extended a plea offer, Pham impermissibly relies on his own conclusory and conflicting assertions that such conversations did not occur. By contrast, Siegel provided coherent, reliable testimony that was corroborated by documentary evidence. Pham fares no better on the issue of prejudice. Even considering the potentially mitigating circumstances that the Second Circuit directed this Court to address, all the objective evidence indicates that Pham would not have accepted the Global Plea Offer.

A.  Communication of the Global Plea Offer

Pham likely did not receive the Global Plea Letter that Siegel sent to him at Otisville on June 16, 1995 because he was transferred to MCC soon thereafter. (GXs 4, 12; Tr. at 136.) However, Siegel met with Pham in an MCC counsel room on June 21 or 22, 1995 – at least four days before the offer was to expire. (GX 5, 23; Tr. at 136-39.) Siegel testified that he explained the essential terms of the Global Plea Offer to Pham at that meeting, showed him the Global Plea Letter and had Kien Tran translate it into Vietnamese. (Tr. at 138-39.) Siegel

testified that he specifically drew Pham's attention to the Government's sentencing calculations and explained the benefit to him in elementary terms:

> This means that after you serve, assuming you take the plea, after 7 years the guard will come over to you and say, okay, Mr. Pham, you can go home now, you finished your term. If you go to trial and you are convicted and you are sentenced to the additional ten years what that means is that after 7 years you can knock on the cell door and say, I finished my time, I am ready to go back, and the guard will say, no, no, Mr. Pham, you have another ten years to serve.

(Tr. at 138-39.) According to Siegel, Pham rejected the plea offer because it required him to plead guilty to kidnapping, stating in substance, "I don't care how much time I am going to get I am not going to plead to something that I didn't do." (Tr. at 139.)

The MCC logbook from that period confirms that such a meeting occurred. (GX 5.) Moreover, Siegel's notes corroborate that he discussed the Global Plea Offer with Pham with the help of Kien Tran. (GX 23.) Siegel noted that Pham was "leaning toward not accepting a plea" at that time. (GX 23.) Thus, the Global Plea Offer expired without Pham accepting it.

Siegel's testimony consists of particularized recollections of his meeting with Pham and is corroborated by independent evidence. Pham attempts to meet this evidence with a generalized disavowal that Siegel ever informed him that the Government extended a plea offer. (Pham Decl. ¶¶ 3-4; Tr. at 14, 38.) However, Pham's testimony was confused and unclear. Pham professed no recollection of testimony he had given earlier in the hearing (Tr. at 78, 83-84), and at times disputed facts on which his Petition is predicated (See Tr. at 10, 24-25, 36). For example, despite the allegation in his Petition that he asked Siegel to negotiate a plea agreement with the Government (which Siegel's testimony supports), Pham testified that he was unable to recall whether he and Siegel had ever talked about the possibility that he would plead guilty. (Tr. at 10, 24-25, 79-80.) Pham also testified, "[Siegel] told me there was an offer from the

government for five or six years, but he did not report to me whether he reach[ed] any reduction of the sentence." (Tr. at 13.) Because of the inconsistencies between and within his submissions and hearing testimony, this Court finds Pham's testimony, albeit through a Vietnamese interpreter, to be unreliable.

Pham also claims that even if Siegel did attempt to discuss the Global Plea Offer with him, the interpreter did not accurately translate the exchange into Vietnamese. However, without additional evidence suggesting that the interpreter failed to perform adequately, Pham cannot foist the discrepancies between his and Siegel's accounts of their June 1995 discussion on bald assertions of mistranslation. See United States v. Villegas, 899 F.2d 1324, 1349 (2d Cir. 1990) (noting that post-trial challenges to the performance of an interpreter are ripe for abuse) (citing Valladares v. United States, 871 F.2d 1564, 1566 (11th Cir. 1989)). Siegel testified credibly that Pham and the interpreter had an amiable relationship. (Tr. at 157.) Pham himself testified that they conversed privately in Vietnamese when she was not translating for Siegel. (Tr. at 43-45.) In reflecting on his interpreted conversations with Pham, Siegel could not discern any disconnect between his end of the conversation and the responses and comments that were being translated as Pham's. (Tr. at 128, 157.) Tellingly, Pham does not contend that any aspect of the interpreter's performance was objectionable other than her alleged failure to translate Siegel's advice concerning the Global Plea Offer. Based on these facts, this Court has no basis to conclude that the interpreter's performance was inadequate or that Siegel failed to monitor the interpreter adequately.

Pham learned at the May 31, 1995 conference with the Court that the Government intended to make a global plea offer to all defendants in his criminal case. (GX 10 at 8.) Pham knew as he prepared for a September 1995 trial that his co-defendants dwindled from nine to one. (Tr. at 53.) Further, in the two-year interval between his conviction and sentence, Pham

reviewed the PSR which specifically detailed how each of the eight co-defendants who pleaded guilty had received sentence reductions as a result. (GX 33R; Tr. at 53, 56-58, 144, 146-47, 174.) Pham admits having this knowledge by the time of his sentencing. (Tr. at 27, 53, 58-59.) Nonetheless, Pham did not complain that Siegel had failed to secure a plea agreement on his behalf until he filed his Petition in November 1999. Nor did Pham complain about his pre-trial interpreter until this proceeding on remand. Prior to trial, Pham and Siegel had numerous meetings and enjoyed a good working relationship. Nevertheless, Pham would have this Court believe he never questioned his attorney about why his co-defendants reached agreements with the Government while he tacked inexorably toward trial and a more severe sentence. Pham asserts that he did not understand that Siegel's alleged failings could impact the validity of his conviction until after his sentencing. (Tr. at 22.) Even so, given Pham's claims that he instructed Siegel "from the very beginning of the proceedings" to pursue a plea bargain sentence of 5 to 8 years, it strains credulity that he would not question Siegel or challenge his effectiveness until two years after receiving a sentence of 17 and a half years.

Accordingly, Pham has not demonstrated to this Court that Siegel provided inadequate assistance of counsel in connection with the Global Plea Offer. To the contrary, the credible and reliable evidence in the record indicates that Siegel communicated the offer to Pham in person at MCC and highlighted its salient aspects, and that Pham knowingly declined it. See Rosario-Dominguez, 353 F. Supp. 2d at 520 (finding counsel's performance was not deficient where the petitioner "submitted only conclusory and/or self-serving affidavits on the issue of whether [his attorney] communicated plea offers to him" whereas his attorney gave "a plausible and appropriately detailed description of their discussions").

B.  Prejudice

Even if Siegel did not communicate the Global Plea Offer, Pham fails to establish that he was prejudiced by Siegel's purported conduct.  That is, for two independent reasons, Pham has not demonstrated by sufficient evidence that he would have pleaded guilty if he had known of the Global Plea Offer.[1]

First, shortly after the Global Plea Offer expired, the Government extended the very same terms to Pham on an individual basis.  (GX 13; Tr. at 103-04.)  In effect, the Government extended the life of the Global Plea Offer beyond June 26, 1995 for Pham and eliminated the condition that all defendants must accept it.  At the reverse proffer session, Applbaum personally informed Pham of the Individual Plea Offer and focused his attention on the fact that he faced a potential sentence two or three times as long as the 78-97 months being offered by the Government.  (Tr. at 107-08.)  As Pham admits, he refused to accept the Individual Plea Offer because it required him to plead guilty to a kidnapping charge.  (Tr. at 51; see Tr. at 110-11, 113.)  Thus, this Court need not speculate whether Pham would have accepted the Global Plea Offer.  Cf. Cullen, 194 F.3d at 405 (describing the likelihood that a defendant would have accepted a plea bargain as "a factual issue, albeit a hypothetical one").  Pham knowingly rejected the Individual Plea Offer which mirrored the Global Plea Offer in all pertinent respects.

---

[1]  The Government also argued on appeal that Pham could not have accepted the Global Plea Offer because it required unanimity and other defendants declined it.  The Second Circuit rejected this argument on the ground that "[t]here is evidence . . . that the government did not enforce the 'global' provision of its offer because four defendants named in the offer pleaded guilty," Pham, 317 F.3d at 184.  There is no evidence in the record before this Court that those plea agreements were forged before the June 26, 1995 expiration of the Global Plea Offer and not separately negotiated offers with the same terms.  See Mickens, 2005 WL 2038589, at *10 (finding no prejudice in the absence of objective evidence that the petitioner's co-defendants "were inclined to accept" the government's global plea offer).  In fact, Applbaum testified that the other four defendants took individual pleas in July and August 1995.  (Tr. at 104.)  Nonetheless, the Government has not pressed that argument on remand.

Second, Pham rests solely on his own self-serving and unsupported statements that he would have accepted the Global Plea Offer. Such evidence is insufficient to establish prejudice. See Pham, 317 F.3d at 182; Gordon, 156 F.3d at 380-81; Rosario-Dominguez, 353 F. Supp. 2d at 521.

In remanding to this Court, the Second Circuit held that "a significant sentencing disparity in combination with defendant's statement of his intention is sufficient to support a prejudice finding." Pham, 317 F.3d at 182 (citing Gordon, 156 F.3d at 381). The Second Circuit faulted the district court for not "consider[ing] the undisputed sentencing disparity of at least 113 months between the high end of the government's plea offer and Pham's sentence after a trial conviction." Pham, 317 F.3d at 182-83. However, Pham was made aware of the sentencing disparity if not by Siegel, than certainly by Applbaum when he explained the terms of the Individual Plea Offer to Pham. Knowing of this sentencing disparity, Pham still refused the offer.

In short, the length of the sentence was not the dispositive factor in Pham's decision. Rather, as Pham, Siegel and Applbaum all testified, Pham steadfastly refused to plead guilty to a kidnapping charge, believing himself to be not guilty of that crime because he did not know that the aliens he helped smuggle were held hostage against their will. (Tr. at 48, 50-51, 110-11, 113, 116-17, 135, 139-40, 165; see also Affirmation of Martin J. Siegel, Esq., dated Nov. 20, 2000, at 1 ("He was quite adamant in his refusal to accept the offer, because as he would often say 'I don't care how much time they give me, I can't plead guilty to something I didn't do.'").) Siegel's notes corroborate that testimony. (GXs 22, 24.) For Pham, his refusal to plead guilty to a crime he believed he did not commit outweighed any benefit he stood to receive by pleading guilty rather than presenting his case to a jury. See United States v. Perez Gomez, No. 3:98CR109 (JBA), 2003 WL 22119123, at *6 (D. Conn. Aug. 29, 2003) ("Another factor to

be considered is Perez Gomez's consistent and unwavering protestations of innocence and the absence of anything . . . suggesting he would have been amenable to negotiating a plea of guilty.").

Pham also claims that Siegel did not sufficiently advise him of the substantive law to enable him to make an accurate assessment of his guilt.  For example, Pham asserts that he was unaware of vicarious liability theories, under which he could be found guilty of a kidnapping conspiracy even if he was unaware that the aliens he had helped smuggle into the United States were held against their will.  (Pham Decl. ¶ 5; Tr. at 17-18, 86-87.)  However, Applbaum explained the nature of vicarious liability to Pham at their February and July meetings.  (Tr. at 110-11.)  Moreover, Applbaum advised Pham at the February proffer sessions that he could be found guilty based on the facts that he admitted, which omitted knowledge that his co-conspirators held the aliens hostage.  (Tr. at 51, 84-85.)

Siegel also testified that he explained to Pham, in substance, that irrespective of his state of mind, "if you are working with these other people in the group, then you are responsible for whatever they do or they fail to do."  (Tr. at 134; see Tr. at 160-61.)  Siegel's explanation states a more expansive theory of conspiracy liability than the law provides.  See, e.g., United States v. Bruno, 383 F.3d 65, 89 (2d Cir. 2004) ("[A] defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of the offense by a co-conspirator in furtherance of the conspiracy was reasonably foreseeable to the defendant as a consequence of their criminal agreement." (emphasis added; internal quotation omitted)) (citing Pinkerton v. United States, 328 U.S. 640, 646-48 (1946)).  Nonetheless, even after being told that he could be found guilty under such a sweeping standard, Pham refused to plead guilty.

Pham also claims that Siegel failed to explain willful blindness to him and that, had he been aware of that concept, Pham would have accepted a plea premised on a willful

blindness theory. (Tr. at 18-19.) However, there is no evidence that the Government would have accepted a plea in which Pham disclaimed knowledge of the crucial aspect of the kidnapping charge. Moreover, contrary to Pham's suggestion, willful blindness requires more than just ignorance of a fact; it requires the conscious and deliberate avoidance of learning that fact. See United States v. Finkelstein, 229 F.3d 90, 95 (2d Cir. 2000) ("The conscious-avoidance doctrine is that . . . the knowledge element is established if the factfinder is persuaded that the defendant consciously avoided learning that fact while aware of a high probability of its existence, unless the factfinder is persuaded that the defendant actually believed the contrary." (citations omitted)); see generally United States v. Reyes, 302 F.3d 48, 54-55 (2d Cir. 2002). Based on his discussions with Pham, Siegel had no reason to believe that Pham consciously avoided learning that aliens were being held hostage or that the Government would pursue such a theory. (Tr. at 163-64.) In fact, Applbaum testified that the Government saw no need to try Pham under a willful blindness theory. (Tr. at 119.) Accordingly, Siegel acted reasonably in declining to advise Pham of this aspect of the law. See Strickland, 466 U.S. at 691 ("Counsel's actions are usually based, quite properly, on informed strategic choices made . . . on information supplied by the defendant.").

Finally, Pham claims that Siegel failed to advise him that, pursuant to North Carolina v. Alford, 400 U.S. 25 (1970), he could plead guilty to a kidnapping charge while maintaining his innocence. (Tr. at 20.) However, Applbaum testified that the United States Attorney for the Southern District of New York was not offering Alford plea agreements at that time. (Tr. at 118.) Accordingly, an Alford plea was not available to Pham and Siegel's failure to explain the nature of such a plea was immaterial.

The objective evidence establishes that Pham persistently maintained that he was not guilty of kidnapping conspiracy and would not plead guilty to such a charge regardless of the

sentence reductions offered by the Government. Because the Global Plea Offer required Pham

to plead guilty to a kidnapping conspiracy, Pham has failed to establish a reasonable probability

that he would have accepted the offer if it had been communicated to him.


II. <u>Motion to Amend the Petition</u>

       Pham also moves to amend his petition to add claims based on <u>Blakely v.

Washington</u>, 542 U.S. 296 (2004), which the Supreme Court subsequently applied to the

Sentencing Guidelines in <u>United States v. Booker</u>, 543 U.S. 220 (2005). A motion to amend a §

2255 motion is analyzed under the standards set forth in Federal Rule of Civil Procedure 15(a).

<u>See</u> <u>Ching v. United States</u>, 298 F.3d 174, 180 (2d Cir. 2002) (citing <u>Littlejohn v. Artuz</u>, 271

F.3d 360, 362-63 (2d Cir. 2001)). Under Rule 15(a), "leave [to amend] shall be freely given

when justice so requires." Fed. R. Civ. P. 15(a). However, "a district court may properly deny

leave when amendment would be futile." <u>Jones v. New York State Div. of Military & Naval

Affairs</u>, 166 F.3d 45, 50 (2d Cir. 1999) (citing <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)).

       Neither <u>Blakely</u> nor <u>Booker</u> is applicable retroactively to a habeas corpus petition

concerning a criminal case that was final before those decisions were issued. <u>Green v. United

States</u>, 397 F.3d 101, 102-03 (2d Cir. 2005); <u>Guzman v. United States</u>, 404 F.3d 139, 144 (2d

Cir. 2005) ("<u>Booker</u> is not retroactive, <u>i.e.</u>, it does not apply to cases on collateral review where

the defendant's conviction was final as of January 12, 2005, the date that <u>Booker</u> was issued.").

As such, the proposed amendment to the Petition would be futile and Pham's motion is denied.

## CONCLUSION

For the foregoing reasons, Pham's Petition to vacate or modify his conviction and sentence is denied. Pham's motion to amend his Petition is also denied. As Pham has not made a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. See 28 U.S.C. § 2253(c). The Clerk of the Court is directed to mark this case closed.

Dated:     December 7, 2005
           New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Copies Mailed To:*

Alexander E. Eisemann, Esq.
282 Katonah Avenue, Suite 244
Katonah, NY  10536
*Counsel for Petitioner*

William F. Johnson, Esq.
Assistant United States Attorney
One St. Andrew's Plaza
New York, NY  10007
*Counsel for Respondent*